**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**REBECCA SOTO,**

$\qquad$ **Plaintiff,**

**-vs-** $\qquad\qquad\qquad$ **Case No.  6:04-cv-782-Orl-28JGG**

**BANK OF AMERICA, NA,**

$\qquad$ **Defendant.**
_____

## ORDER

Plaintiff Rebecca Soto ("Ms. Soto") brings the instant action against her former employer, Bank of America NA, ("Bank of America" or "the Bank") alleging national origin and race discrimination and retaliation under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., and the Florida Civil Rights Act of 1992 ("FCRA"), §§ 760.01-.11, 509.092, Florida Statutes.  Ms. Soto, who describes herself as "a Hispanic female of Puerto Rican descent," claims that she was terminated based on her national origin and race and in retaliation for complaining about being treated less favorably than similarly-situated Caucasian employees.  Ms. Soto also alleges that she was denied equal pay on the basis of her race in violation of Section 725.07, Florida Statutes.  Bank of America maintains, however, that Ms. Soto was terminated for repeated violations of Bank policy and longstanding performance deficiencies and that she was not treated any differently than comparable Caucasian employees, including in terms of salary.

This case is currently before the Court on Bank of America's Fully Dispositive Motion

for Summary Judgment (Doc. 40), in response to which Ms. Soto has filed a Memorandum in Opposition (Doc. 48).  The Court heard oral argument on the motion on July 25, 2005.  (See Mins., Doc. 50).  Having considered the parties' arguments, the record, and pertinent law, and as more specifically set forth below, the Court grants Bank of America's motion for summary judgment as to all of Ms. Soto's claims.

## I.  Factual Background

Ms. Soto was employed by Bank of America or one of its predecessors from September 24, 1984 until she was terminated on March 6, 2003.  She was hired by Barnett Bank in 1984 as a senior teller at the Apopka branch.  (Dep. of Rebecca Soto at 28-29).  After working as a senior teller for six months, Ms. Soto became a new accounts representative – what is now known at the Bank as a "personal banker."  (Id. at 29).

Ms. Soto worked at the Apopka branch until 1994, at which time she was promoted to the position of sales and service manager at the Red Bug Road office in Casselberry.  (Id. at 30, 33-34).  She worked in that position for one year and then requested a transfer to a Brevard County branch because she was moving to Brevard County to accommodate her husband's job.  (Id. at 38).  There was no position available in Brevard County for a sales and service manager, so Ms. Soto asked to return to her position as a new accounts representative; she was permitted to return to that position and was assigned to the West Melbourne branch in Brevard County.  (Id. at 38-39).

After Barnett merged with NationsBank, in 1999 Ms. Soto was transferred to the Malabar office – also in Brevard County – and remained in her same position, which was

then known as "senior personal banker." (Id. at 41-42).  In 2001, Ms. Soto was transferred, at her request,[1] from the Malabar office to the Wickham Road office – the office at which she worked as a senior personal banker until her March 2003 termination.  (Id. at 43).

During at least the last four years of her employment at the Bank, Ms. Soto often disagreed with her performance appraisals and other written statements regarding her work. In February 1999, an Employee Conference Report noted that Ms. Soto had not been completing her daily and weekly reports in an acceptable fashion; she was informed that failure to improve would result in further disciplinary action.  (Ex. 1 to Decl. of Victor Scapicchio, at BOA 0026).  In response to this Report, Ms. Soto stated in part, "[The manager] demands that her reports take precedence over servicing her customers.  I have had a difficult time understanding her reasoning since I do know that most of the information she requests is already in the system and it is the customer who will ultimately generate the points that she wants to see in these reports."  (Ex. 1 to Decl. of Victor Scapicchio, at BOA 0027).

In her Performance Appraisal for the period covering March 1998 to February 1999, which was completed in May 1999, Ms. Soto received scores of 2's, 3's, and one 4 (on a

---

[1]Ms. Soto explained in her deposition that she requested the transfer because she was not happy with "some situations" at the Malabar office, and she "realized that it would be best . . . to just transfer to another office."  (Soto Dep. at 43).  Ms. Soto clarified that the "situations" involved disparaging comments that the banking center manager made about former Barnett employees being "a thorn in his flesh."  (Id. at 43-45).  Ms. Soto considered such comments "derogatory and discriminatory."  (Id. at 44-45).  Ms. Soto also was upset with the manager because she inquired about getting into the management program, known as "MAPS," and the manager told her that to get into that program she had to be consistently meeting all of her goals; Ms. Soto asked to see such a requirement in writing, and he never produced such a writing.  (Id. at 46).

scale of 1 to 5), with an averaged rating of 2.58.  (Ex. 2 to Scapicchio Decl., at BOA 0116).

In the comments to that appraisal, it was noted that Ms. Soto "does not work with a

preconceived plan to get to the sales production standards set by the bank" (id. at BOA

0121); that she "insists on getting all her vacation choices because of her seniority . . .

[s]ometimes causing arguments and dissension among team members" (id. at BOA 122);

that she "has difficulty prioritizing" and "does not remain positive and will become very

defensive and combative when she is feeling overwhelmed with the job responsibilities" (id.

at BOA 0122).  Additionally, it was noted that Ms. Soto "[d]oes not take ownership of her

actions" and "is very experienced and could be a top performer in the company if she

followed the NationsBank formula for success" (id. at BOA 0123).  In response to this

appraisal, Ms. Soto submitted comments stating in part, "I have always strived to reach my

goals. [The manager] is incorrect in stating I have refused to track my sales. [The manager]

does not mention we have had to work under an 'uncomfortable' and 'intimidating'

atmosphere."  (Id. at BOA 0124).

　　　An interim review of Ms. Soto's performance for the period from April 1999 to October

1999 was completed in December 1999.  (Ex. 3 to Scapicchio Decl.).  In that review, Ms.

Soto was noted to be "a strong sales closer" and "a very strong customer champion" with "a

very loyal customer base."  (Id. at BOA 0129).  However, she also was described as having

inconsistent sales results and needing improvement on work prioritization and remaining

focused on tasks.  (Id. at BOA 0129).  Her reviewer, Jim Lynch, noted:  "[Ms. Soto] has

expressed a desire to be entered into the MAPS program.  She has been informed that the

beginning point for consideration into that program is to be successful in the above two

-4-

categories [Goal Achiever and Pipeline Builder] by attaining and exceeding sales goals consistently, and to uti[]lize the tools and activities availab[l]e to all sales associates (i.e. customer book, customer profiles, mortgage comparisons, refinance comparisons, etc[.]) consistently."  (Id. at BOA 0131).  Ms. Soto responded by noting in part, "In an ideal environment where we are not lacking staff and support from our management team perhaps the sales goals would be consistent, however, that has not been the case at our banking center."  (Id. at BOA 0132).

In April 2001, Ms. Soto was counseled regarding her sales performance.  (Scapicchio Decl. at 7 ¶ 17; Ex. 4 to Scapicchio Decl.).  Ms. Soto was informed at that time that "[d]isciplinary action may be taken should sustained improvement not be made over the next 60 days." (Ex. 4 to Scapicchio Decl., at BOA 0622).

Ms. Soto's performance appraisal for the period October 2000 to October 2001 was completed in March 2002.  (Ex. 5 to Scapicchio Decl.)  In that review, Ms. Soto was rated as not meeting expectations in the areas of "Drives for Results," "Customer Satisfaction and Retention," and "Relationship Building."  (Id. at BOA 0044-0045).  It was noted that Ms. Soto's "primary development need is to utilize her sales tools . . . to consistently improve her sales." (Id. at BOA 0049).

In March 2002, an "Associate Formal Verbal Conference" was documented after Ms. Soto "transferred funds from one business account to another without proper[ly] identifying signers." (Ex. 6 to Scapicchio Decl., at BOA 0031).  It was noted that "[Ms. Soto's] actions may have resulted in a loss to the bank and a loss of a long term business account." (Id. at BOA 0031).  Ms. Soto was advised that "[f]ailure to follow policy and procedures and Core

Values may result in further disciplinary actions, up to and including termination." (Id.).  Ms. Soto responded to this document by noting that no loss had actually resulted to the bank and that it was one mistake in eighteen years.  (Id.).

In her deposition, Ms. Soto testified regarding this March 2002 funds transfer incident. She stated that she had asked a teller to reverse deposits for the customer after the customer informed her that he had made two deposits into two accounts but had put the wrong deposit into each account. (Soto Dep. at 269).  The Banking Center Manager, Lisa Wilder, later called Ms. Soto into her office and told her that one of the accounts did not belong to that customer and he was not a signer on it; thus, that customer could not properly get those deposits reversed.  (Id. at 270).  Ms. Soto was surprised to learn that the customer was not a signer on the account; she said, "I didn't even consider that when I made the reversal of the deposit.  He was a customer that came in daily, and he had the deposit tickets, the deposit books to both accounts, so it never occurred to me that he wouldn't be a signer on both accounts."  (Id. at 271).  She acknowledged that she did not check the computer system on the account to ensure that the customer was in fact named on the account when she did the reversal.  (Id. at 272).  Ms. Wilder explained in her deposition that Ms. Soto was given this written conference "[b]ecause she had transferred accounts from one business to another without verifying ownership of the account, and the owner of that company called and reamed [Wilder] out."  (Lisa Wilder Dep. at 68).

In August 2002, Ms. Soto told Regional Manager Victor Scapicchio that branch employees were – contrary to policy – using the passwords of another senior personal banker, J.W., in order to credit sales to J.W.  (Aff. of Rebecca Soto, Pl.'s Ex. B, at 2 ¶ 9).

Ms. Soto also told Mr. Scapicchio that L.H. was improperly transacting business on accounts of her family members.  (Id.).  In response to these concerns raised by Ms. Soto, Ms. Wilder held a meeting of all of the branch employees on September 26, 2002 regarding unauthorized use of passwords.  (Id. at 2 ¶ 13).  All employees, including Ms. Soto, were required to change their passwords and to sign a copy of the Bank's Conflict of Interest policy.  (Id. at 2-3 ¶ 13).  Additionally, three employees were counseled regarding password sharing and one was counseled regarding potentially transacting business on relatives' accounts.  (Ex. 14 to Scapicchio Decl.).

This Conflict of Interest policy prohibits bank associates from, inter alia, "handl[ing] or process[ing] transactions on [their] own accounts or those of a family member" and "engag[ing] in any other conduct which poses a conflict or potential conflict of interest or violate any other provisions in the Code of Ethics."  (Ex. 11 to Scapicchio Decl.).  "Family member" is defined to include "relatives or anyone else with an especially close personal relationship."  (Id.).  Additionally, the "Code of Conduct" in the Bank of America Associate Handbook provides in part, "You must avoid all circumstances that could produce conflicts between your personal interests and those of the company."  (Ex. 6 to Decl. of Susan Reynolds, at BOA 0185).

In August 2002, Ms. Wilder received telephone calls from a bank customer, L.S.,[2] and her attorney regarding Ms. Soto's processing of a loan application in the name of L.S. and

_____

[2]The parties refer to some employees and customers by their initials rather than by their names.  Although the parties have been inconsistent in this practice, the Court will refrain from naming these people and will use initials as well.

her husband, C.S.  (Decl. of Lisa Wilder at 4 ¶ 8).  L.S. was upset about the processing of

the application because Ms. Soto was a friend of L.S. and C.S. and knew that they were in

the midst of divorce proceedings, yet Ms. Soto had accepted the application from C.S. in

both of their names.  (Id.).  In her deposition, Ms. Soto acknowledged processing a loan

application for C.S. in July 2002 when she knew that he and his wife were discussing

divorce.  (Soto Dep. at 309, 311).  Ms. Soto also acknowledged that Ms. Wilder had told her

about L.S's attorney being very upset about her name being put on the loan application.  (Id.

at 315).  Ms. Soto denied that Ms. Wilder raised any concern to her about this loan

application being a conflict of interest, but she conceded that Ms. Wilder at least told her that

C.S. had put Ms. Soto in an awkward position.  (Id. at 315-16).

     C.S. was a former employee of the Bank whom Ms. Soto met in 1992 at a bank

function after Hurricane Andrew.  She also met Mr. Scapicchio at that time, and for a time

she, Mr. Scapicchio, C.S., and another bank employee socialized together approximately

once a month.  Ms. Soto, C.S., and their spouses traveled together in Spain on a vacation.

(Soto Dep. at 302).  After C.S. left employment with the Bank, he went to work as a flight

attendant for Delta Airlines, and he gave Ms. Soto "buddy passes" – vouchers entitling the

holder to a significantly discounted airfare – on approximately five occasions, including one

a few days before Ms. Soto's February 2005 deposition.  (Id. at 308-09).  It was common

knowledge at the Wickham Road banking center that C.S. gave Ms. Soto these buddy

passes.  (Id. at 310).

     In October 2002, Ms. Soto was evaluated by Lisa Wilder.  (Ex. 7 to Scapicchio Decl.).

Ms. Soto received an overall score of 3.81 on a scale of 1-10.  (Id. at BOA 1504).  Ms. Soto

responded to this evaluation by noting in part, "Numbers do not always reflect a true picture of the efforts put forward in the workplace." (Id. at BOA 1504).

On November 11, 2002, Ms. Soto filed a charge of national origin discrimination and retaliation with the EEOC and the Florida Commission on Human Relations. (Ex. 1 to Dep. of Elisa Bain). In that charge, Ms. Soto alleged that she had been retaliated against by being denied entrance into the MAPS management training program and that Lisa Wilder had told her she was not reaching her sales goals. Ms. Soto also alleged that several bank employees had "conspired to direct potential sales customers to" a non-Hispanic employee. (Id.).

In an Associate Conference Report dated October 30, 2002 and signed in December 2002, Ms. Soto was counseled regarding two issues. (Ex. 8 to Scapicchio Decl.). First, it was noted that Ms. Soto had been coached regarding signature cards not being notarized. Second, it was noted that Ms. Soto had allowed a customer into the bank during non-business hours for non-bank business. Ms. Soto was advised that "[f]ailure to follow policy and procedures may result in further discipl[in]ary action, up to and including termination." (Id. at BOA 0028).

Ms. Soto's performance appraisal for the period October 2001 to October 2002 was completed in December 2002 (Ex. 9 to Scapicchio Decl.). Ms. Soto was rated as not meeting expectations in several areas, including "Builds Relationships" and "Contributes to the Team." (Id. at BOA 0038). She also was rated as below expectations in all five of the Bank's "Core Values": "Doing the Right Thing," "Trusting and Teamwork," "Inclusive Meritocracy," "Winning," and "Leadership." (Id. at BOA 0039).

In an Associate Conference Report dated January 15, 2003 and signed on February 24, 2003, Ms. Soto was counseled based on her performance.  (Ex. 10 to Scapicchio Decl.). Ms. Soto was advised of "[f]ailure to meet expectations in the position of Sr. Personal Banker" and that she had "not performed at a level expected to be successful in [her] job." (Id. at BOA 0033).

In January 2003, Ms. Soto refunded a stop payment fee on the account of C.S.'s mother.  (Soto Dep. at 323).  In February 2003, Ms. Soto refunded an insufficient funds fee on the account of C.S. and his mother.  (Soto Dep. at 299).

In February 2003, Ms. Soto accepted a loan application from S.L. and T.L.  (Soto Dep. at 321).  S.L. was a former bank employee whom Ms. Soto knew.  Ms. Soto had obtained permission from personnel to open a money market account for S.L. in May 2002, but Ms. Wilder had told her not to do any maintenance on that account.  (Soto Dep. at 320).  Ms. Soto did not view accepting the loan application in February 2003 as having anything to do with not performing maintenance on their money market account and did not see any potential conflict.  (Soto Dep. at 321-22).

On March 6, 2003, Ms. Soto was terminated by Regional Manager Victor Scapicchio and Banking Center Manager Lisa Wilder.  It is undisputed that Ms. Soto was replaced by a Hispanic woman.  Mr. Scapicchio is also Hispanic.  A "Memo to File" signed by Mr. Scapicchio regarding Ms. Soto's termination stated that Ms. Soto was terminated for "failure to adhere to the Conflict of Interest expectations" of the Bank.  (Ex. 13 to Scapicchio Decl.). The memo noted, inter alia, the two refunds that Ms. Soto had made to the account of "a close friend," C.S. (Id.).

Ms. Soto filed a second charge of discrimination with the EEOC and the Florida Commission on Human Relations on August 8, 2003 alleging retaliation and discrimination based on race and national origin.  (Ex. C to Doc. 1).  Ms. Soto filed this lawsuit in state court (Attach. to Doc. 1), and it was removed to this Court (Doc. 1).

II.  Discussion

A.  Summary Judgment Standards

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the burden of establishing that no genuine issues of material fact remain.  Celotex Corp. v. Catrett, 477 U.S. 317 (1986).

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations."  Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir. 1997).  "The evidence presented cannot consist of conclusory allegations or legal conclusions."  Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991); see also Fed. R. Civ. P. 56(e) (providing that nonmovant's response "must set forth specific facts showing that there is a genuine issue for trial").

In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party.

-11-

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).   However, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.   Moreover, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

"Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." Sawyer v. Southwest Airlines Co., 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing Anderson, 477 U.S. at 250-51).   "'In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial.'   Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" Id. (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988) and Anderson, 477 U.S. at 251-52); see also LaRoche v. Denny's, Inc., 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").   "[T]he summary judgment rule applies in job discrimination cases just as in other cases.   No thumb is to be placed on either side of the scale." Chapman v. AI Transp., 229 F.3d 1012, 1026 (11th Cir. 2000).

B.  The Merits of Bank of America's Motion

Ms. Soto alleges three types of claims:  claims of race and national origin discrimination under the FCRA and Title VII (Counts I and IV); claims of retaliation under the FCRA and Title VII (Counts II and V); and a claim of unequal pay under Section 725.07(1), Florida Statutes (Count III).  Bank of America argues that it is entitled to summary judgment on all of Ms. Soto's claims because, it contends, Ms. Soto has not presented a prima facie case of discrimination and because she has not raised a genuine issue as to whether the Bank's explanations for its actions were mere pretexts for discrimination.

1.  Race/National Origin Discrimination Claims (Counts I and IV)

Ms. Soto has not presented any direct evidence of discrimination.  Thus, she relies on the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and its progeny in order to establish her disparate treatment claims by circumstantial evidence.  See, e.g., EEOC v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1286 (11th Cir. 2000) ("Disparate treatment claims require proof of discriminatory intent either through direct or circumstantial evidence. . . . Absent direct evidence, a plaintiff may prove intentional discrimination through the familiar McDonnell Douglas paradigm for circumstantial evidence claims.") (citations omitted); accord Harris v. Sec'y of the Army, 119 F.3d 1313, 1320 (8th Cir. 1997) ("Because she has no direct evidence of discrimination, Harris' sex discrimination claim is governed by the burden shifting analysis first articulated in McDonnell Douglas Corp. v. Green").  Under this framework, the plaintiff in a disparate treatment case has the initial burden to establish a prima facie case of discrimination by a preponderance of the evidence.

McDonnell Douglas.  As the Eleventh Circuit has noted, "[d]emonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination."  Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997).  If the plaintiff establishes a prima facie case, a presumption of discrimination arises.  See, e.g., Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981).

Once the plaintiff has presented a prima facie case and its attendant presumption, the burden "shift[s] to the employer to articulate some legitimate, nondiscriminatory reason" for its actions.  McDonnell Douglas, 411 U.S. at 802.  The employer's "burden is one of production, not persuasion; it 'can involve no credibility assessment.'"  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993)).  If the employer meets its burden of production, "'the McDonnell Douglas framework – with its presumptions and burdens' – disappear[s], and the sole remaining issue [is] 'discrimination vel non.'"  Reeves, 530 U.S. at 142-43 (quoting St. Mary's Honor Ctr., 509 U.S. at 510, and U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 714 (1983)).  In order to prevail on a claim of disparate treatment, the plaintiff must establish that the employer acted with a discriminatory animus.  Edwards v. Wallace Cmty. Coll., 49 F.3d 1517, 1520 (11th Cir. 1995) (citing Burdine).

It has been held that "[t]o establish a prima facie case of discriminatory discharge, the plaintiff must show that she (1) was a member of a protected class, (2) was qualified for the job, (3) suffered an adverse employment action, and (4) was replaced by someone outside the protected class."  Cuddeback v. Fla. Bd. of Educ., 381 F.3d 1230, 1235 (11th Cir. 2004).  Ms. Soto satisfies the first and third of these elements because she is Hispanic/of Puerto

Rican descent and she was terminated.  The Bank contends that Ms. Soto was not qualified for her job.  However, "in termination cases, the question of whether the plaintiff was qualified to do the job is not often at issue.  '[I]n cases where a plaintiff has held a position for a significant period of time, qualification for that position sufficient to satisfy the test of a *prima facie* case can be inferred.'" Crapp v. City of Miami Beach, 242 F.3d 1017, 1020 (11th Cir. 2001) (quoting Rosenfield v. Wellington Leisure Prods., Inc., 827 F.2d 1493, 1495 n.2 (11th Cir. 1987)) (alteration and emphasis in original).  Ms. Soto was a senior personal banker for years, and thus she satisfies the "qualified" prong of her prima facie case.

The Bank also challenges Ms. Soto's satisfaction of the fourth element.  Although the Bank is correct that Ms. Soto does not satisfy this articulation of the prima facie case because she was replaced by a Hispanic female rather than by someone outside of her protected class, the fourth prima facie element has alternatively been stated to require that the plaintiff show that she "was treated less favorably than a similarly-situated individual outside [her] protected class." Maynard v. Bd. of Regents, 342 F.3d 1281, 1289 (11th Cir. 2003).  Ms. Soto contends that she was treated less favorably because she was discharged while similarly-situated non-Hispanic employees were retained.

Ms. Soto asserts that other employees who were found to have conducted transactions for friends or relatives were counseled instead of terminated.  However, Ms. Soto had been progressively counseled and warned for some time before she was ultimately terminated in March 2003, and she has not presented evidence of similar repeated conduct by anyone else, nor does she dispute her long history of sales deficiencies or identify anyone else with similarly poor sales who was retained.  Thus, she has not shown that any similarly-

situated non-Hispanic employee was treated more favorably.

Moreover, even giving Ms. Soto the benefit of the doubt on the satisfaction of her burden of presenting a prima facie case of discrimination, her claims fail.  Bank of America has articulated legitimate nondiscriminatory reasons for its termination of Ms. Soto – that her performance was poor and that Ms. Soto did not abide by the conflict-of-interest policy even after she was counseled as to both problems.  Thus, Bank of America is entitled to summary judgment on the discriminatory termination claims unless Ms. Soto presents evidence creating a genuine issue of material fact regarding whether these reasons are a mere pretext for discrimination.  See, e.g., Chapman v. AI Transp., 229 F.3d 1012, 1024-25 (11th Cir. 2000) ("If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim."); accord Evans v. McClain of Ga., Inc., 131 F.3d 957, 964-65 (11th Cir. 1997) ("Under the established rule of law in this Circuit, a plaintiff can survive a motion for summary judgment or for judgment as a matter of law by presenting evidence sufficient to demonstrate a genuine issue of material fact as to the truth or falsity of the employer's legitimate, nondiscriminatory reasons.").

As the Eleventh Circuit has explained, "[t]he inquiry into pretext centers upon the employer's beliefs, and not the employee's own perceptions of his performance.  Thus, where the employer produces performance reviews and other documentary evidence of misconduct and insubordination that demonstrate poor performance, an employee's assertions of his own good performance are insufficient to defeat summary judgment, in the

absence of other evidence." Holifield, 115 F.3d at 1565 (citations omitted).  In determining whether an issue has been raised as to pretext, this Court "must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct.'" Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997) (quoting Cooper-Houston v. S. Ry. Co., 37 F.3d 603, 605 (11th Cir. 1994) (citation omitted)).  This assessment involves an "evaluat[ion of] whether the plaintiff has demonstrated 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" Combs, 106 F.3d at 1538 (quoting Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1072 (3d Cir. 1996) (citation and internal quotation marks omitted)).

Ms. Soto has not cast doubt on Bank of America's reasons. Cf. Tidwell v. Carter Prods., 135 F.3d 1422, 1427 (11th Cir. 1998) (finding no issue raised as to pretext where evidence presented by plaintiff did "not provide the needed 'more than a mere scintilla of evidence' to survive a motion for judgment as a matter of law" and did "not present a substantial conflict in the evidence as to [the employer's] purported reason for terminating Tidwell . . . as to support a jury question").  She has not raised a genuine issue of material fact as to whether Bank of America had a good faith belief that Ms. Soto had violated the Bank's Conflict of Interest policy and was not a good performer despite receiving numerous warnings.  Ms. Soto admits engaging in the transactions which the Bank has identified as problematic, and she concedes that she did not meet her sales goals.   Her mere

disagreement with the Bank's assessment of her performance or with the wisdom of its policies does not impeach the Bank's good faith opinion of Ms. Soto as an employee. Regardless of Ms. Soto's opinion of the "closeness" of her relationship with C.S., for example, Ms. Soto acknowledged receiving Delta Airlines "buddy passes" from him on approximately five occasions and that it was well-known at the Bank that he gave her these passes. This alone would seem to entitle the Bank to find an impermissible conflict of interest under its policy, regardless of the "closeness of Ms. Soto's relationship with C.S.

When Ms. Soto was asked to describe incidents of national origin discrimination, she stated in her deposition: "Well, what I experienced was unfair treatment. And I didn't see anyone else experiencing it. I, of course, was the only Hispanic in my banking center. I expressed, on numerous occasions, that I felt that I was treated differently. And so because I was the only Hispanic person in the banking center, obviously I perceived that to be – that it was a – that they were discriminating against me because I was Hispanic. All the time that I felt the – every time that they were treating me unfairly, it had to do with things that nobody else was being treated unfairly for. It was just different treatment towards me." (Soto Dep. at 103-04). Ms. Soto's assertions that her termination was based on her race or national origin are purely speculative, and the fact that both her replacement and the man who fired her, Mr. Scapicchio, are also Hispanic belies a discriminatory motive by the Bank. Ms. Soto's assertions that employees sometimes made fun of foreign accents in the office are not sufficient to establish an issue as to pretext.

In sum, Ms. Soto's disagreement with the Bank's assessment of her is not sufficient to create a triable issue on her claims. In essence, Ms. Soto seeks to have this Court step

in and second-guess Bank of America's business decisions.  This the Court will not do.  <u>Cf.</u> <u>Davis v. Town of Lake Park</u>, 245 F.3d 1232, 1244 (11th Cir. 2001) ("A contrary view would potentially open the door to a wide variety of unfair work assignment claims that should not be litigated in the federal courts.  Title VII is not designed to make federal courts '"sit as a super-personnel department that reexamines an entity's business decisions."'" (quoting <u>Elrod</u> <u>v. Sears, Roebuck & Co.</u>, 939 F.2d 1466, 470 (11th Cir. 1991)); <u>Tidwell</u>, 135 F.3d at 1427 ("'[A] plaintiff may not establish that an employer's proffered reason is pretextual merely be questioning the wisdom of the employer's reason, at least not where, as here, the reason is one that might motivate a reasonable employer.'") (quoting <u>Combs v. Plantation Patterns</u>, 106 F.3d 1519, 1543 (11th Cir. 1997)) (alteration in original); <u>Smith v. Ala. Dep't of Pub.</u> <u>Safety</u>, 64 F. Supp. 2d 1215, 1228 (M.D. Ala. 1999) ("'[T]he court's responsibility [is] not to second guess the wisdom of [Defendant's] reasoning, but to determine if the reasons given were merely a cover for discriminatory intent.'") (quoting <u>Brown v. Am. Honda Motor Co.</u>, 939 F.2d 946, 951 (11th Cir. 1991)) (all but first alteration in original).  Thus, Bank of America's motion for summary judgment on Ms. Soto's discriminatory termination claims shall be granted.

### 2. Retaliation Claims (Counts II and V)

Ms. Soto also claims that she was terminated in retaliation for filing a charge with the

EEOC in November 2002.  To make a prima facie[3] showing of retaliation,[4] a plaintiff must

establish:  (1) that she engaged in activity protected by Title VII; (2) that the employer was

aware of such activity; (3) that the employee suffered an adverse employment action; and

(4) a causal link between the protected activity and the adverse action.  Maniccia v. Brown,

171 F.3d 1364, 1369 (11th Cir. 1999).  Ms. Soto has satisfied the first three of these

elements.  She engaged in protected activity when she filed a charge of discrimination with

the EEOC in November 2002,[5] and the Bank became aware of it shortly thereafter.  And,

_____

[3]The burden-shifting framework of McDonnell Douglas and its progeny discussed in connection with the disparate treatment claims applies to the retaliation claims as well.

[4]The anti-retaliation provision of Title VII provides in part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).

[5]The Bank contends that Ms. Soto did not engage in statutorily protected activity because she did not have a good faith, reasonable belief that the Bank had discriminated against her based on her national origin.  Ms. Soto responds that such reasonableness need not be shown when the participation clause of Section 2000e-3(a) – rather than the opposition clause – is at issue. The Eleventh Circuit apparently has not addressed whether such a showing of reasonableness is required under the participation clause.  See Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1455 (11th Cir. 1998) ("Because we conclude that the facts of this case, viewed in the light most favorable to Wideman, show that Wideman had a good faith, reasonable basis for filing her charge, we need not decide whether protection from retaliation under the participation clause is conditioned by a good faith, reasonable basis requirement.").  The Court gives Ms. Soto the benefit of the doubt on this issue and finds this element satisfied by the filing of her November 2002 EEOC charge.

obviously, she suffered an adverse employment action when she was terminated on March 6, 2003.

The Bank challenges whether Ms. Soto has satisfied the "causal connection" prong of her prima facie case of retaliation. "This circuit has interpreted the causal link requirement broadly; 'a plaintiff merely has to prove that the protected activity and the negative employment action are *not completely unrelated.*'" Coutu v. Martin County Bd. of County Comm'rs, 47 F.3d 1068, 1074 (11th Cir. 1995) (quoting EEOC v. Reichhold Chems., Inc., 988 F.2d 1564, 1571-72) (11th Cir. 1993)) (emphasis added). "For purposes of a prima facie case, 'close temporal proximity' may be sufficient to show that the protected activity and the adverse action were not 'wholly unrelated.'" Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 590 (11th Cir.) (quoting Farley v. Nationwide Mut. Ins. Co., 197 F.3d 1322, 1337 (11th Cir. 1999)).

Ms. Soto contends that she has satisfied the "causal connection" element of her prima facie retaliation case due to the close temporal proximity between her first EEOC charge and her termination. Periods as short as three months have been held insufficient in and of themselves to allow a reasonable inference of causation in this Circuit. See, e.g., Higdon v. Jackson, 393 F.3d 1211, 1221 (11th Cir. 2004) ("By itself, the three month period between the September 29 letter and the December 31 incident does not allow a reasonable inference of a causal relation between the protected expression and the adverse action."). Here, the time lag between Ms. Soto's November 11, 2002 EEOC charge and her March 6, 2003 termination was nearly four months. However, construing the evidence in Ms. Soto's favor, the Bank was not aware of the charge until late December 2002 and the

decisionmakers were not aware of it until even later than that.  Thus, Ms. Soto has – if only marginally so – set forth a prima facie case of retaliation based on close temporal proximity.

In any event, however, as set forth in the prior section, the Bank has articulated reasons for its termination of Ms. Soto and Ms. Soto has not presented evidence creating an issue as to whether those reasons are merely pretextual.  Ms. Soto's retaliation claims fail on this same basis.

### 3.  Equal Pay Claim (Count III)

Ms. Soto also brings a claim for denial of equal pay under Section 725.07, Florida Statutes, which prohibits "discriminat[ion] against any person based on sex, marital status, or race in the areas of loaning money, granting credit, or providing equal pay for equal services performed." § 725.07(1), Fla. Stat.  The Bank correctly notes that "there is a paucity of interpretive law" regarding this statute and analogizes the equal pay claim to a disparate pay claim under Title VII. (Def.'s Mot. for Summ. J. & Mem. of Law, Doc. 40 at 18 n.8).  Ms. Soto does not take issue with this approach, and this claim will be analyzed under the framework employed in the other sections of this Order.

The Bank contends that Ms. Soto's equal pay claim fails because she cannot establish that she received unequal pay for equal services performed.  The Bank asserts that Ms. Soto has not identified any equally-performing comparators.  The Bank also contends that Ms. Soto has no evidence of race playing a role in the establishment of salaries at the Bank and that Ms. Soto has not presented evidence creating a genuine issue of material fact as to the Bank's performance-based salary system.  The Bank is correct, and there is no

merit to Ms. Soto's assertions of race-based disparate pay.

Ms. Soto complains that she did not receive a raise after the October 2002 review period while another senior personal banker, N.W., did receive a raise despite being counseled for exceeding her "Freedom to Act Guidelines" during that period.  Ms. Soto emphasizes that she had worked for the bank for nineteen years at that point while N.W. had only been there for four years.  Ms. Soto also notes that another personal banker, J.W., received a raise on April 1, 2003 despite being counseled during that period.  Ms. Soto, however, did not work for the bank as of that date and thus could not have been given a raise at that time; thus, J.W. is not a proper comparator.

Ms. Soto's contention that her failure to receive raises was based on her race is nothing more than speculation.  As noted by the Bank – and not refuted by Ms. Soto – N.W. was hired in 1999 as a senior personal banker and at that time was paid the same salary that Ms. Soto then earned.  (Decl. of Susan Reynolds at 12 ¶ 25).  N.W. was promoted to a position of Customer Service Specialist in 2001 and was earning $1841.60 more than Ms. Soto at the time Ms. Soto was fired.  (Id.).  The Bank asserts that N.W. was a stronger performer than Ms. Soto, and Ms. Soto does not rebut this contention, instead averring only that N.W. had been counseled during the period after which she was given a raise.  Given the abundant evidence of Ms. Soto's performance issues and the Bank's performance-based salary structure, Ms. Soto has not cast doubt on the performance-related reasons for any pay disparities.

III.  Conclusion

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

1.  Bank of America's Fully Dispositive Motion for Summary Judgment (Doc. 40) is **GRANTED** on all of Ms. Soto's claims.

2.  All other pending motions are **DENIED as moot**.

3.  The Clerk is directed to enter a judgment in favor of Defendant Bank of America, NA on all of Ms. Soto's claims.  Thereafter, the Clerk shall close this file.

**DONE** and **ORDERED** in Orlando, Florida this 1st day of November, 2005.

_____
JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record
Unrepresented Party